Breitel, J.
This appeal involves the revocability of an election of benefits under a public employees’ retirement system and suggests the need for a renewed examination of the kinds of mental incompetency which may render voidable the exercise of contractual rights. The particular issue arises on the evidently unwise and foolhardy selection of benefits by a 60-year-old teacher, on leave for mental illness and suffering from cerebral arteriosclerosis, after service as a public schoolteacher and participation in a public retirement system for over 40 years. The teacher died a little less than two months after making her election of maximum benefits, payable to her during her life, thus causing the entire reserve to fall in. She left surviving her husband of 38 years of marriage and two grown children.
There is no doubt that any retirement system depends for its soundness on an actuarial experience based on the purely prospective selections of benefits and mortality rates among the covered group, and that retrospective or adverse selection after the fact would be destructive of a sound system. It is also true that members of retirement systems are free to make choices which to others may seem unwise or foolhardy. The issue here is narrower than any suggested by these basic principles. It is whether an otherwise irrevocable election may be avoided *199 for incapacity because of known mental illness which resulted in the election when, except in the barest actuarial sense, the system would sustain no unfavorable consequences.
The husband and executor of Grace W. Ortelere, the deceased New York City schoolteacher, sues to set aside her application for retirement without option, in the event of her death. It is alleged that Mrs. Ortelere, on February 11, 1965, two months before her death from natural causes, was not mentally competent to execute a retirement application. By this application, effective the next day, she elected the maximum retirement allowance (Administrative Code of City of New York, § B20-46.0). She thus revoked her earlier election of benefits under which she named her husband a beneficiary of the unexhausted reserve upon her death. Selection of the maximum allowance extinguished all interests upon her death.
Following a nonjury trial in Supreme Court, it was held that Grace Ortelere had been mentally incompetent at the time of her February 11 application, thus rendering it ‘ ‘ null and void and of no legal effect ”. The Appellate Division, by a divided court, reversed the judgment of the Supreme Court and held that, as a matter of law, there was insufficient proof of mental incompetency as to this transaction (31 A D 2d 139).
Mrs. Ortelere’s mental illness, indeed, psychosis, is undisputed. It is not seriously disputable, however, that she had complete cognitive judgment or awareness when she made her selection. A modern understanding of mental illness, however, suggests that incapacity to contract or exercise contractual rights may exist, because of volitional and affective impediments or disruptions in the personality, despite the intellectual or cognitive ability to understand. It will be recognized as the civil law parallel to the question of criminal responsibility which has been the recent concern of so many and has resulted in statutory and decisional changes in the criminal law (e.g., A. L. I. Model Penal Code, § 4.01; Penal Law, § 30.05; Durham v. United States, 214 F. 2d 862).
Mrs. Ortelere, an elementary schoolteacher since 1924, suffered a “ nervous breakdown ” in March, 1964 and went on a leave of absence expiring February 5, 1965. She was then 60 years old and had been happily married for 38 years. On July 1, 1964 she came under the care of Dr. D’Angelo, a psychiatrist, who *200 diagnosed her breakdown as involutional psychosis, melancholia type. Dr. D ’Angelo prescribed, and for about six weeks decedent underwent, tranquilizer and shock therapy. Although moderately successful, the therapy was not continued since it was suspected that she also suffered from cerebral arteriosclerosis, an ailment later confirmed. However, the psychiatrist continued to see her at monthly intervals until March, 1965. On March 28, 1965 she was hospitalized after collapsing at home from an aneurysm. She died 10 days later; the cause of death was “ Cerebral thrombosis due to H[ypertensive] H[eart] D[isease].”
As a teacher she had been a member of the Teachers’ Retirement System of the City of New York (Administrative Code, § B20-30). This entitled her to certain annuity and pension rights, preretirement death benefits, and empowered her to exercise various options concerning the payment of her retirement allowance.
Some years before, on June 28, 1958, she had executed a “ Selection of Benefits under Option One ” naming her husband as beneficiary of the unexhausted reserve. Under this option upon retirement her allowance would-be less by way of periodic retirement allowances, but if she died before receipt of her full reserve the balance of the reserve would be payable to her husband. On June 16, 1960, two years later, she had designated her husband as beneficiary of her service death benefits in the event of her death prior to retirement.
Then on February 11, 1965, when her leave of absence had just expired and she was still under treatment, she executed a retirement application, the one here involved, selecting the maximum retirement allowance payable during her lifetime with nothing payable on or after death. She also, at this time, borrowed from the system the maximum cash withdrawal permitted, namely, $8,760. Three days earlier she had written the board, stating that she intended to retire on February 12 or 15 or as soon as -she received ‘ ‘ the inf ormation I need in order to decide whether to take an option or maximum allowance.” She then listed eight specific questions, reflecting great understanding of the retirement ¡system, concerning the various alternatives available. An extremely detailed reply was sent, by letter of February 15,1965, although by that date it was technically impossible *201 for her to change her selection. However, the board’s chief clerk, before whom Mrs. Ortelere executed the application, testified that the questions were ‘ ‘ answered verbally by me on February 11th.” Her retirement reserve totalled $62,165 (after deducting the $8,760 withdrawal), and the difference between electing the maximum retirement allowance (no option) and the allowance under “ option one ” was $901 per year or $75 per month. That is, had the teacher selected “option one” she would have received an annual allowance of $4,494 or $375 per month, while if no option had been selected she would have received an annual allowance of $5,395 or $450 per month. Had she not withdrawn the cash the annual figures would be $5,247 and $6,148 respectively.
Following her taking a leave of absence for her condition, Mrs. Ortelere had become very depressed and was unable to care for herself. As a result, her husband gave up his electrician’s job, in which he earned $222 per week, to stay home and take care of her on a full-time basis. She left their home only when he accompanied her. Although he took her to the Retirement Board on February 11,1965, he did not know why she went, and did not question her for fear "she’d start crying hysterically that I was scolding her. That’s the way she was. And I wouldn’t upset her.”
The Orteleres were in quite modest -circumstances. They owned their own home, valued at $20,000, and had $8,000 in a savings account. They also owned some farm land worth about $5,000. Under these -circumstances, as revealed in this record, retirement for both of the Orteleres or the survivor of them had to be provided, as a practical matter, largely out of Mrs. Ortelere’s retirement benefits.
According to Dr. D ’Angelo, the psychiatrist who treated her, Mrs. Ortelere never improved enough to “ warrant my sending her back [to teaching].” A physician for the Board of Education examined her on February 2, 1965 to determine her fitness to return to teaching. Although not a psychiatrist but rather a specialist in internal medicine, this physician ‘ ‘ judged that she had apparently recovered from the depression ’ ’. and that she appeared rational. However, before allowing her to return to teaching, a report was requested from Dr. D ’Angelo concerning her condition. It is notable that the Medical Division of the *202 Board of Education on February 24, 1965 requested that Mrs. Ortelere report to the board’s “ panel psychiatrist ” on March 11, 1965.
Dr. D’Angelo stated “ [a]t no time since she was under my care was she ever mentally competent ’ ’; that ‘ ‘ [m] entally she couldn’t make a decision of any kind, actually, of any kind, small or large.” He also described how involutional melancholia affects the judgment process: “ They can’t think rationally, no matter what the situation is. They will even tell you, ‘ I used to be able to think of anything and make any decision. Now,’ they say, ‘ even getting up, I don’t know whether I should get up or whether I should stay in bed.’ Or, 'I don’t even know how to make a slice of toast any more. ’ Everything is impossible to decide, and everything is too great an effort to even think of doing. They just don’t have the effort, actually, because their nervous breakdown drains them of all their physical energies.”
While the psychiatrist used terms referring to “ rationality ”, it is quite evident that Mrs. Ortelere’s psychopathology did not lend itself to a classification under the legal test of irrationality. It is undoubtedly, for this reason, that the Appellate Division was unable to accept his testimony and the trial court’s finding of irrationality in the light of the prevailing rules as they have been formulated.
The well-established rule is that contracts of a mentally incompetent person who has not been adjudicated insane are voidable. Even where the contract has been partly or fully performed it will still be avoided upon restoration of the status quo. (Verstandig v. Schlaffer, 296 N. Y. 62, 64; Blinn v. Schwarz, 177 N. Y. 252, 262; see, also, Ann., Contracts with Incompetent, 95 A. L. R. 1442; Ann., Incompetent—Contract Before Adjudication, 46 A. L. R. 416.)
Traditionally, in this State and elsewhere, contractual mental capacity has been measured by what is largely a cognitive test (Aldrich v. Bailey, 132 N. Y. 85; 2 Williston, Contracts [3d ed.], § 256; see 17 C.J.S., Contracts, § 133 [1], subd. e, pp. 869-862). Under this standard the ‘ ‘ inquiry ’ ’ is whether the mind was "so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction ” (Aldrich v. Bailey, supra, at p. 89). A requirement that *203 the party also be able to make a rational judgment concerning the particular transaction qualified the cognitive test (Paine v. Aldrich, 133 N. Y. 544, 546; Note, “ Civil Insanity The New York Treatment of the Issue of Mental Incompetency in NonCriminal Cases, 44 Cornell L. Q. 76). Conversely, it is also well recognized that contractual ability would be affected by insane delusions intimately related to the particular transaction (Moritz v. Moritz, 153 App. Div. 147, affd. 211 N. Y. 580; see Green, Judicial Tests of Mental Incompetency, 6 Mo. L. Rev. 141, 151).
These traditional standards governing competency to contract were formulated when psychiatric knowledge was quite primitive. They fail to account for one who by reason of mental illness is unable to control his conduct even though his cognitive ability seems unimpaired. "When these standards were evolving it was thought that all the mental faculties were simultaneously affected by mental illness. (Green, Mental Incompetency, 38 Mich. L. Rev. 1189, 1197-1202.) This is no longer the prevailing view (Note, Mental Illness and the Law of Contracts, 57 Mich. L. Rev. 1020, 1033-1036).
Of course, the greatest movement in revamping legal notions of mental responsibility has occurred in the criminal law. The nineteenth century cognitive test embraced in the M’Naghten rules has long been criticized and changed by statute and decision in many jurisdictions (see M’Naghten’s Case, 10 Clark & Fin. 200; 8 Eng. Rep. 718 [House of Lords, 1843]; Weihofen, Mental Disorder as a Criminal Defense [1954], pp. 65-68; British Royal Comm, on Capital Punishment [1953], ch. 4; A. L. I. Model Penal Code, § 4.01, supra; cf. Penal Law, § 30.05).
While the policy considerations for the criminal law and the civil law are different, both share in common the premise that policy considerations must be based on a sound understanding of the human mind and, therefore, its illnesses. Hence, because the cognitive .rules are, for the most part, too restrictive and rest on a false factual basis they must be re-examined. Once it is understood that, accepting plaintiff’s proof, Mrs. Ortelere was psychotic and because of that psychosis could have been incapable of making a voluntary selection of her retirement system benefits, there is an issue that a modern jurisprudence should not exclude, merely because her mind *204 could pass a “ cognition ” test based on nineteenth century psychology.
There has also been some movement on the civil law side to achieve a modern posture. For the most part, the-movement has been glacial and has been disguised under traditional formulations. Various devices have been used to avoid unacceptable results under the old rules by finding unfairness or overreaching in order to avoid transactions (see, e.g., Green, Proof of Mental Incompetency ' and the Unexpressed Major Premise, 53 Yale L. J. 271, 298-305).
In this State there has been at least one candid approach. In Faber v. Sweet Style Mfg. Corp. (40 Misc 2d 212) Mr. Justice Meyer wrote: “ [ijncompetence to contract also exists when a contract is entered into under the compulsion of a mental disease or disorder but for which the contract would not have been made ” (at p. 216; noted in 39 N.Y.U. L. Rev. 356). This is the first known time a court has recognized that the traditional standards of incompetency for contractual capacity are inadequate in light of contemporary psychiatric learning and applied modern standards. Prior to this, courts applied the cognitive standard giving great weight to objective evidence of rationality (e.g., Beisman v. New York City Employees’ Retirement System, 81 N. Y. S. 2d 373, revd. 275 App. Div. 836, affd. 300 N. Y. 580; Schwartsberg v. Teachers’ Retirement Bd., 273 App. Div. 240, affd. 298 N. Y. 741; Martin v. Teachers’ Retirement Bd., 70 N. Y. S. 2d 593).
It is quite significant that Restatement, 2d, Contracts, states the modern rule on competency to contract. This is in evident recognition, and the Reporter’s Notes support this inference, that, regardless of how the cases formulated their reasoning, the old cognitive test no longer explains the results. Thus, the new Restatement section reads: “ (1) A person incurs only voidable contractual duties by entering into a transaction if by reason of mental illness or defect * * * (b) he is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition.” (Restatement, 2d, Contracts [T.D. No. 1, April 13, 1964], § 18C.) (See, also, Allen, Ferster, Weihofen, Mental Impairment and Legal Incompetency, p. 253 [Recommendation b] and pp. 260-282; and Note, 57 Mich. L. Rev. 1020, supra, where it is recommended *205 ‘ ‘ that a complete test for contractual incapacity should provide protection to those persons whose contracts are merely uncontrolled reactions to their mental illness, as well as for those who could not understand the nature and consequences of their actions ” [at p .1036]).
The avoidance of duties under an agreement entered into by those who have done so by reason of mental illness, but who have understanding, depends on balancing competing policy considerations. There must be stability in contractual relations and protection of the expectations of parties who bargain in good faith. On the other hand, it is also desirable to protect persons who may understand the nature of the transaction but who, due to mental illness, cannot control their conduct. Hence, there should be relief only if the other party knew or was put on notice as to the contractor’s mental illness. Thus, the Restatement provision for avoidance contemplates that “ the other party has reason to know ” of the mental illness (id.).
When, however, the other party is without knowledge of the contractor’s mental illness and the agreement is made on fair terms, the proposed Restatement rule is: “ The power of avoidance under subsection (1) terminates to the extent that the contract has been .so performed in whole or in part or the circumstances have so changed that avoidance would be inequitable. In .such a case a court may grant relief on such equitable terms as the situation requires.” (Restatement, 2d, Contracts, supra, § 18C, subd. [2].)
The system was, or should have been, fully aware of Mrs. Ortelere’s condition. They, or the Board of Education, knew of. her leave of absence for medical reasons and the resort to staff psychiatrists by the Board of Education. Hence, the other of the conditions for avoidance is satisfied.
Lastly, there are no significant changes of position by the system other than those that flow from the barest actuarial consequences of benefit selection.
Nor should one ignore that in the relationship between retirement system and member, and especially in a public system, there is not involved a commercial, let alone an ordinary commercial, transaction. Instead the nature of the system and its announced goal is the protection of its members and those in whom its members have an interest. It is not a sound scheme *206 which would permit 40 years of contribution and participation in the system to be nullified by a one-instant act committed by one known to be mentally ill. This is especially true if there would be no substantial harm to the system if the act were avoided. On the record none may gainsay that her selection of a “ no option ” retirement while under psychiatric care, ill with cerebral arteriosclerosis, aged. 60, and with a family in which she had always manifested concern, was so unwise and foolhardy that a factfinder might conclude that it was explainable only as a product of psychosis.
On this analysis it is not difficult to see that plaintiff’s evidence was sufficient to sustain a finding that, when she acted as she did on February 11, 1965, she did so solely as a result of serious mental illness, namely, psychosis. Of course, nothing less serious than medically classified psychosis should suffice or else few contracts would be invulnerable to some kind of psychological attack. Mrs. Ortelere’s psychiatrist testified quite flatly that as an involutional melancholiac in depression she was incapable of making a voluntary “ rational ” decision. Of course, as noted earlier, the trial court’s finding and perhaps some of the testimony attempted to fit into the rubrics of the traditional rules. For that reason rather than reinstatement of the judgment at Trial Term there should be a new trial under the proper standards frankly considered and applied.
Accordingly, the order of the Appellate division should be reversed, without costs, and the action remanded to Trial Term for a new trial.