KATHLEEN KENNEDY et al., as Executors of THOMAS J. WHALEN, Deceased, Respondents-Appellants, v NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM et al., Appellants-Respondents.

First Department, March 11, 1976

*Martin H. Selman* of counsel *(L. Kevin Sheridan* with him on the brief; *W. Bernard Richland, Corporation Counsel),* for appellants-respondents.

*Norman H. Dachs* of counsel *(Beth Goldmacher* with him on the brief; *Mack, Grady, Ricca & Donnelly* and *Shayne, Dachs, Weiss, Kolbrener, Stanisci & Harwood,* attorneys), for respondents-appellants.

SILVERMAN, J. In this action plaintiffs, the executors and beneficiaries of the estate of a deceased former employee of the City of New York, Thomas J. Whalen, seek the benefit of Option 1 of the New York City Retirement System Plan (Administrative Code of City of NY, § B3-46.0) which in essence gives to the deceased employee's estate or beneficiaries the unused balance of the value of his pension annuity account as it was at the time of his retirement. In cases of employees who die before retirement or shortly after retirement this option is the most favorable to the employee's estate or beneficiaries. The Retirement System contends that this case is governed by the so-called "maximum retirement allowance" provisions which give the retired employee the maxi-

mum annual allowance during his life, but nothing to his estate or beneficiaries. Formally the scheme of choice of benefits gives the employee the choice of the "maximum retirement allowance," or four optional modifications, each providing something for the estate or surviving beneficiaries (Administrative Code, § B3-46.0), but of course always at a price in terms of a reduced allowance during his lifetime.

Plaintiffs' first cause of action is based on section B3-36.0 (subd 4, par [d], cl [3]) of the New York City Administrative Code which provides, with exceptions not here applicable, that: "if any retired member dies on or after the effective date of his retirement and prior to the first payment on account of his retirement allowance, and had not elected Option 1, 2, 3 or 4 with respect to such retirement, he shall be deemed to have elected Option 1 with respect thereto." In this case the employee Mr. Whalen filed an application for retirement dated December 11, 1970, and specified March 16, 1971 as the effective date of his retirement. Under the language of that application, failing to cross out a specified box was an election "to receive the maximum allowance payable during my life without optional modification, subject to my right to change to an optional benefit before the first payment on account of my retirement allowance"; and Mr. Whalen failed to cross out that box.

The employee retired on March 16, 1971. He died on November 3, 1971.

In the interim he received six monthly checks of $604 each which are concededly "advance payments" which under the general authorizing resolution do not constitute a "first payment." (Board of Estimate Rule 81, as amd April 24, 1969.) On October 6, 1971, the retiree received and deposited a check for $5,722.79 being the amount of maximum allowance of $1,434.41 per month for the period through September 30, 1971, less the six checks for $604 each which he already received as advance payments. These payments were made by the Comptroller without any formal action by the Board of Trustees as to this employee's particular case; the payments were purportedly made pursuant to a general authorizing resolution of the Board of Estimate (the trustees' predecessor) (Resolution No. 66, July 24, 1958). On October 22, 1971, the Board of Trustees adopted a resolution in essence formalizing the Comptroller's figures including the date of the employee's retirement, the amount of his annual retirement allowance,

the amount of the reserves and the proportions from which the payments would be made from each reserve. (A check dated October 31, 1971 for $1,434.41, the employee's retirement allowance for October was mailed to the retiree and apparently, deposited in his account, perhaps after his death by one of the plaintiffs.)

Plaintiffs contend that a resolution of the Board of Trustees was necessary before the retiree could be deemed retired and that thus only a check after October 22, 1971 could be deemed "a first payment" cutting off the beneficiaries' right to receive Option 1. We do not agree. We deem it unnecessary to decide whether for some other purpose a resolution of the Board of Trustees would be necessary before retirement could be deemed fully effective. But the quoted statute (§ B3-36.0, subd 4, par [d], cl [3]) does not say a "first payment after a resolution of the Board." The reference in the statute to "retired member" is merely descriptive of the person and not a requirement of some particular legal status. Indeed, strictly speaking, there is no such thing as a "retired member." As appellants themselves urge, an employee is only a "member" until he retires; after retirement he is a "beneficiary" (Administrative Code, § B3-1.0, subds 6, 8). But the phrase "retired member" is a convenient way of referring to the person involved. The dates which bring into play section B3-36.0 (subd 4, par [d], cl [3]) are plainly stated in the statute. The beginning date is the "effective date of his retirement," here plainly March 16, 1971; and the ending date is "the first payment on account of his retirement allowance." Plainly the check of October 6, 1971 was intended and understood from its amount to be the first payment on account of the retiree's retirement allowance.

Accordingly, the Special Term properly granted summary judgment dismissing the first cause of action.

As to the second cause of action: On August 23, 1971, the decedent executed a selection of benefits for maximum retirement allowance payable throughout his life. In the second cause of action plaintiffs allege that the decedent intended to elect Option 1 and that his selection of maximum retirement allowance on August 23, 1971 "did not conform to his intentions and was executed by reason of decedent's inability to understand the nature and quality of his act" etc. and by reason of this "incompetency" the August 23, 1971 selection of benefits was void.

There is nothing in the record to indicate that at any time after December, 1970 decedent intended to elect Option 1. At one time—in 1965—decedent had tentatively elected Option 1. But in the December 11, 1970 application for service retirement, he indicated his choice of maximum allowance. He did check a box requesting information as to figures, not under Option 1 but under Option 4, costing him much less in the way of reduced retirement allowance than Option 1 and correspondingly giving a much smaller benefit to survivors than Option 1. But even this request by its terms was a "Request For Approximate Figures—Not A Selection Of Option." Under date of July 19, 1971, the actuary of the Retirement System wrote to the retiree giving him approximate figures as to maximum retirement allowance and as to the effect of selecting Option 1 or Option 4. The figures thus given indicated that if decedent selected Option 1, his retirement allowance would be $3,500 a year less than if he selected maximum retirement allowance. Forms were sent to him for selection of benefits "without optional modification" (i.e., maximum retirement allowance) as well as under Options 1 and 4. On August 23, 1971, decedent executed a form for election of maximum retirement allowance. This form plainly stated at the head of it "Selection Of Benefits Without Optional Modifications" and on the next line "No Benefit Payable After Death." Decedent's alleged conversations with one of the plaintiffs in which he said he was going to select Option 1 can be given no weight in the face of this consistent history. (Indeed, it is not unknown for elderly persons to state to prospective beneficiaries that they are making more generous provision for the beneficiaries out of their estates than is the fact.)

The decedent was unmarried and he had no dependents; the choice of maximum retirement allowance during his life was not bizarre.

Nor is there anything to show that in fact decedent was suffering from such mental incapacity as to invalidate his August 23, 1971 choice. Plaintiffs say that decedent was suffering from "cirrhosis of the liver, coronary arteriosclerosis and anemia," as a result of which he suffered "periods of mental confusion and disorientation," and his doctor—not a psychiatrist—stated that it was "quite possible" that on the date he executed the August 23, 1971 selection of benefits, decedent was in a state of mental confusion and was mentally

incompetent. Decedent's condition on August 23, 1971 does not appear to be anything approaching the "medically classified psychosis" required by *Ortelere v Teachers' Retirement Bd. of City of N. Y.* (25 NY2d 196, 206). And there is no suggestion that decedent was incompetent on December 11, 1970 when he executed his application for service retirement stating his desire to receive maximum retirement allowance. Decedent never modified that selection in the 11 months that remained of his life. Defendants' motion for summary judgment dismissing the second cause of action should have been granted.

By hindsight it would appear that the retiree's choice was an unwise one and plaintiffs' case is thus appealing. But an actuarially sound retirement system disposing of finite assets must have some rules as to which classes of retirees get which benefits. An annuity system like any insurance plan proceeds on the assumption that some annuitants will die long before their life expectancy while others will long survive their life expectancy; and the money saved on the reserves of those who die early can be used to finance the allowances to those who die later, thus assuring to all annuitants the security and peace of mind that come from knowing that, however long or short a time they may live, they will have this income for life. But this inherently requires that at some point the annuitant's decision should be final. For if hindsight were permitted to govern, then, of course, the beneficiaries of all annuitants who die before their reserve was used up would choose to take the balance of the reserve leaving nothing to take care of the annuitants who live longer than their life expectancy.

Wherever the line is drawn, the choice seems and is hard on the persons just on the wrong side of the line. The present line is itself an effort to meet the hard cases. It gives the benefit to the estates of prospective annuitants who die before the effective date of their retirement (cf. Administrative Code, § B3-36.0, subd 4, par [d], cl [1]—the elimination of the "death gamble"). A related system gives the benefit to beneficiaries of those who die within 30 days after the effective date of retirement (cf. New York City Teachers' Retirement System, Administrative Code, § B20-40.0). The Retirement System with which we are concerned gives this benefit to beneficiaries of those who die before the date of first payment, here seven months after retirement. Each of these benefits, of course, means fewer cases where unused reserve is available for long-living annuitants. And this reduction must be made up some-

how, whether by increased contributions or reduced benefits to others, including possibly lower maximum retirement allowances to those who choose to make no provision for their survivors. And if the plan were further extended to give the benefits of Option 1 to estates of annuitants who die within say 30 days after the first payment, as did this annuitant, (a) that would further reduce reserves available for longer-living survivors and the amount of the maximum retirement allowance available to all annuitants and (b) there would still be a hardship on the survivors of annuitants who die on the 31st day.

We are dealing with a choice made by a city employee as to what should be done with the benefits he had earned by his work during his lifetime. Being unmarried and having no dependents he chose the security and peace of mind of knowing that he would receive the maximum allowance for his whole life, short or long, with no provision for his survivors; and he in fact received (in the October 6 check) the higher allowance thus chosen for the six and one-half months between his retirement and his death. It is not for us to say that he should have made a different choice.

The order of the Supreme Court, New York County (HELMAN, J.), entered January 20, 1975 granting defendants' motion for summary judgment to the extent of dismissing the first cause of action and denying defendants' motion for summary judgment as to the second cause of action and denying plaintiff's cross motion for summary judgment, should be modified, on the law, so as to grant defendants' motion for summary judgment dismissing the second cause of action and, as so modified, affirmed, without costs.

STEVENS, P. J., MURPHY, CAPOZZOLI and NUNEZ, JJ., concur.

Order, Supreme Court, New York County, entered on January 20, 1975, unanimously modified, on the law, so as to grant defendants' motion for summary judgment dismissing the second cause of action and, as so modified, affirmed, without costs and without disbursements.