UNITED STATES of America, Plaintiff,

v.

James C. MANNY et al., Defendants.

No. 76 Civ. 5082 (KTD).

United States District Court,
S. D. New York.

Dec. 6, 1978.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for the United States; William G. Ballaine, Asst. U. S. Atty., New York City, of counsel.

Windels, Marx, Davies & Ives, New York City, for defendants; Kenneth W. Greenawalt, Robert D. Taisey, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This action arises as a result of a dispute between the United States government and the co-executors of the estate of Walter Roy Manny. The government is seeking a judgment for unpaid estate taxes and interest of $1,023,486.51 plus statutory additions. Defendants contend that the bulk of this amount has been paid by virtue of the tender of 3½% United States Treasury Bonds with a face amount of $775,000. The government, however, has rejected this tender on the grounds that the bonds were not owned by decedent at his death, and

hence, were ineligible for redemption at par.

The parties have consented to a trial on stipulated facts to resolve the question whether the bonds were in fact owned by Walter Roy Manny at his death. A summary of these facts is essential to an understanding of the posture in which the case arises as well as the legal theories which the parties espouse.

On May 27, 1972 Walter Roy Manny suffered a mild stroke while vacationing in Woodstock, Vermont. He was eighty-one (81) years old at the time and was hospitalized in nearby Hanover, New Hampshire. During his confinement, Mr. Manny discussed with his son, defendant James C. Manny, the handling of his business and personal affairs. A year earlier Mr. Manny had executed a General Power of Attorney and Four Special Powers of Attorney appointing James C. Manny and H. E. Johnson, as his co-attorneys in fact.

At the suggestion of Mr. Johnson, an accountant and co-attorney in fact, James Manny discussed with his ailing father the advisability of purchasing United States Treasury Bonds, known as Flower Bonds[1] to be redeemed at par for the payment of any Federal estate taxes which might be assessed against his estate. Walter Roy Manny told his son to proceed with the purchase of the Bonds. He also concurred in the suggestion that Mr. Johnson review his portfolio and make recommendations regarding which of his securities should be sold to pay for the Bonds.

Thereafter, on June 6, 1972, Walter Roy Manny suffered a severe stroke and on June 9 he lapsed into a coma from which he was never to recover. While he was in this comatose state, on June 19, 1972, the disputed Bonds were purchased at the prevailing

---

1. Flower Bonds are so called because of the manner in which they "bloom" at the death of their owner. *Estate of Watson v. Simon*, 586 F.2d 925 (2d Cir. 1978). That is, the bonds, which sell at a substantial discount, may be redeemed at par in payment of estate taxes so long as the conditions promulgated by the Treasury Department are met. The disparity between the market value and face value of the

bonds is due to the low interest rate which they yield. Yet it makes them an extremely attractive investment in anticipation of federal estate taxes.

The government no longer issues Flower Bonds, however, a number of earlier issues, such as the one in question at bar, are still available on the open market.

market place prices and paid for out of Walter Roy Manny's funds on deposit on his custodian account in the Bank of New York. Securities sold on June 20 and June 21, 1972 helped to cover the cost of the Bonds. Mr. Manny died on June 27, 1972.

The Bonds had a face amount of $775,000 and were bearer form. They carried the following legend on their face:

This bond, upon the death of the owner, will be redeemed at the option of the duly constituted representatives of the deceased owner's estate, at par and accrued interest, if it constitutes part of such estate and the proceeds are to be applied to the payment of federal estate taxes as in said Circular provided [referring to Treasury Department Circular 1052].

The Bonds had been issued on October 3, 1960 pursuant to Treasury Department Circular 1052. This Circular included the following pertinent terms and conditions:

Any bonds issued hereunder which upon the death of the owner constitute a part of his estate, will be redeemed at the option of the duly constituted representatives of the deceased owner's estate, at par and accrued interest to date of payment, *provided* :

(a) that the bonds were actually owned by the decedent at the time of his death; and

(b) that the Secretary of the Treasury be authorized to apply the entire proceeds of redemption to the payment of Federal estate taxes.

On or about March 27, 1973, defendants filed an estate tax return showing the disputed Bonds as assets and reflecting a tax liability of $1,026,988.61. The estate paid this liability by tendering the Bonds, the interest accrued thereon ($9,890.88) and cash of $242,107.73.

The Bonds were redeemed at par and a total of $784,890.88, reflecting their face value plus accrued interest, was credited to the District Director of Internal Revenue, Manhattan, New York, in partial payment of the estate's Federal tax liability.

On or about September 29, 1973 an audit of the estate was commenced by the Internal Revenue Service ["IRS"]. During the course of the audit, a question arose as to the eligibility of the Bonds for redemption in partial payment of the estate's Federal tax liability. In February, 1975, the matter was referred to the Department of the Treasury, Bureau of Public Debt. The commissioner of that bureau notified defendants that the Bonds had been erroneously redeemed since in his view Walter Roy Manny's agents lacked the requisite authority to make a binding purchase on his behalf. Mr. Manny's lack of mental capacity, it was explained, vitiated the power of his attorneys-in-fact and, accordingly, Mr. Manny was not the "actual owner" of the Bonds at the time of his death.

The estate sought review of this determination from the Fiscal Assistant Secretary to the Department of Treasury. The Fiscal Assistant Secretary affirmed the decision of the Bureau of Public Debt and on February 6, 1976, the estate was formally advised of the government's decision to rescind the earlier redemption of the Bonds. The government offered to return the Bonds and also issued a check to the estate for $81,375 representing three years' interest thereon. The estate refused the proffer of the Bonds and returned the check, insisting that the Bonds were eligible for redemption.

In December, 1975, before the government had reversed its prior redemption of the Bonds, the IRS filed a claim in Surrogate's Court where the estate was being probated. The IRS asserted two estimated claims for estate taxes, one for $775,000 and one for $15,000.[2] On March 29, 1976, after the estate tax audit was completed, the IRS issued a statutory notice of deficiency to the estate in the amount of $195,311.63.[3]

---

2. The $775,000 related to the redemption question.

3. The amount was expected to be reduced by a $180,490.76 credit leaving a balance of $14,820.87 due the government in federal estate taxes. Stipulation, Exh. 14.

The attachment to the notice disclosed that the IRS had accepted the estate's valuation of the Bonds at par for estate tax purposes but noted that this was done

> solely for protective purposes in the event it is determined that the refusal of the Bureau of the Public Debt to redeem the bonds at face value in payment of your estate tax liability was incorrect.
>
> In the event it is finally determined that the Bureau of the Public Debt action was correct, and the Treasury bonds are ineligible for payment of taxes, then, to the extent permitted by *Internal Revenue Code of 1954, Section 6512(a)*, the estate tax liability will be reduced accordingly.

The estate filed a petition in Surrogate's Court on May, 1976, in an effort to resolve both the redemption issue and the tax deficiency. Following discussions with the government, the estate agreed to withdraw the proceeding in Surrogate's Court and thus, enable the United States to commence the instant action. The only issue before me at this time is the question of the eligibility of the Bonds for redemption at par for Federal estate tax purposes. All concede that if decedent was the owner of the bonds at his death, then they are so eligible.

The government takes the position that federal law governs the eligibility of the Bonds for redemption at par. This reliance on federal law is an apparent shift from the position earlier taken by the Bureau of Public Debt. In his letter to the estate, the commissioner of that bureau indicated that under applicable New York law, an agent's authority to act on behalf of his principal is terminated when that principal falls into a comatose state. Exhibits 15 and 16. The government now contends that federal law should control, since "the rights and duties of the United States on commercial paper which it issues" are governed by federal rather than local law. *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

The question before me is basically one of agency law. In setting out what it considers to be the federal principles of agency law governing the eligibility of the bonds for redemption, the government relies upon the Restatement of Agency, New York cases (*In re Berry's Estate,* 69 Misc.2d 397, 329 N.Y.S.2d 915 (Sur.Ct.1972); *Merritt v. Merritt,* 27 App.Div. 208, 50 N.Y.S. 604 (1st Dep't 1898)); one New Jersey case (*Foster v. Reiss,* 18 N.J. 41, 112 A.2d 553 (1955)) and one tax court case applying New York law (*Estate of John Dierks,* 40 T.C. 539 (1963)). It is thus, apparent that there is no true Federal rule, see *Estate of Pfohl,* 70 T.C. 630 (August 7, 1978). Moreover, the general principles of law propounded by the government are not inconsistent with New York law and thus, I conclude, as did the tax court in *Pfohl,* that whether the applicable standard be federal or local, the result is the same.

■ It is a general principle of agency law that an agent's authority is coterminous with that of his principal and "[t]hus there is no authority unless the principal has the capacity to enter into the legal relations sought to be created by the agent." Restatement of Agency (Second), [hereinafter Restatement] § 7, Comment a. As do most general rules, this basic principle has its exceptions. Restatement § 122 recognizes such an exception in the case of brief periods of insanity caused by mental or physical illness. *Id.* comment d. Thus, while a judicial declaration that the principal is insane clearly terminates the authority of his agent, "the agent of one who becomes mentally incompetent to act on his own account . . . does not necessarily lose authority to act for the principal." *Id.*

■ Courts grappling with the question of temporary insanity have by and large concluded that transactions entered into on the principal's behalf by the agent are not void but rather are voidable. They may be ratified or rejected by the principal upon his recovery or by his duly appointed representative. *Bankers Trust Co. v. Martin,* 51 A.D.2d 411, 381 N.Y.S.2d 1001 (1976). *See also Ortelere v. Teachers' Retirement Board of New York,* 25 N.Y.2d 196, 303 N.Y.S.2d 362, 250 N.E.2d 460 (1969); *Verstandig v. Schlaffer,* 296 N.Y. 62, 70 N.E.2d 15 (1946);

*Finch v. Goldstein,* 245 N.Y. 300, 157 N.E. 146 (1927); *Blinn v. Schwartz,* 177 N.Y. 252, 69 N.E. 542 (1904).

The government takes the position that, notwithstanding this treatment of temporary insanity, where the principal is in a comatose state and hence clearly incapacitated, the authority of his agent is automatically suspended. It finds authority for this position in the general principles of agency law, *see* Restatement *supra* ; as well as in four principal cases. In the first, *Merritt v. Merritt,* 27 App.Div. 208, 50 N.Y.S. 604 (1898) [hereinafter *Merritt I* ], the Appellate Division of the Supreme Court of the State of New York was called upon to determine the validity of a mortgage executed by an agent of a principal who was *non compos mentis.* In that case, the principal had executed a power of attorney in favor of her agent who thereafter executed the disputed mortgage. Although the principal was sane at the time she gave the power of attorney, she was insane at the time the mortgage was executed and the mortgagee knew of her insanity. Thus, the precise question before the Court was whether "one who [dealt] with a lunatic, knowing him to be such at the time, is protected in his dealing[s] and acquires rights against the lunatic, because the transaction is had with a person who holds a power of attorney made by the lunatic at a time when he was sane". *Id.* at 605. The Court answered the question in the negative. In so holding it quoted extensively from a New Hampshire case, *Davis v. Lane,* 10 N.H. 156. That case contains language supportive of the government's position. Discussing the authority of an agent to act for his principal pursuant to a revocable power of attorney, the *Davis* Court noted that

> when . . . an act of Providence deprives the principal of the power to exercise any judgment or will on the subject [of the power], the authority of the agent to act should thereby be suspended for the time being; otherwise, the right of the agent would be continued beyond the period when all evidence that the principal chose to continue the authority had ceased . . . .
>
> . . . . .

> [W]e are of opinion that the insanity of the principal or his incapacity to exercise any volition upon the subject, by reason of an entire loss of mental power, operates as a revocation or suspension for the time being, of the authority of an agent acting under a revocable power.

See 50 N.Y.S. 607.

Although this view of the consequences of incapacity was approved by the *Merritt* court, in fact *Merritt I* had a much more limited holding. That is, when one undertakes to deal with an agent knowing of his principal's insanity, the transaction has no more weight than if it had been done with the principal himself. Indeed, when the appellate division was called upon to hear the case once more following remand, *Merritt v. Merritt,* 43 App.Div. 68, 59 N.Y.S. 357 (1899) [hereinafter *Merritt II* ], the Court held that even if the principal was insane, the mortgage was at most voidable and that equity would intercede to enforce it in a proper case. *Id.* at 359.

The government also relies upon a New Jersey case involving an alleged gift *causa mortis. Foster v. Reiss,* 18 N.J. 41, 112 A.2d 553 (1955). The question arose whether the decedent's husband had authorization to appropriate certain property pursuant to a note left by the decedent just before she underwent surgery. The husband did not learn of the note until his wife was already under anesthesia and, accordingly, the Court noted that it conveyed no authority. The Court cited Restatement § 122 for the proposition that the authority of an agent is suspended when the principal is deprived of capacity to become a party to the agreement. *Id.* at 561.

As additional support for its position the government cites *Estate of John Dierks,* 40 T.C. 539 (1963) a case in which an agent of Mr. Dierks entered into a stipulation of settlement with the Internal Revenue Service ["IRS"] while Dierks was in a coma. The IRS knew of Dierks' incapacity at the time. Representatives of the decedent moved to vacate the stipulation on the

grounds that when decedent lapsed into a coma the power of attorney given to his agent almost a year earlier was revoked or suspended. The tax court agreed, and following the reasoning of *Merritt I* and its adoption of the *Davis* case, held that, under the circumstances of the case before it, the power of attorney given by Dierks was suspended or revoked on the date he lapsed into a coma.

The facts of *Dierks* differ from those at bar. In the first place, the party seeking to enforce the agreement in *Dierks* knew of the principal's incapacity at the time of contract. Moreover, in *Dierks* the power of attorney was given almost a year before its exercise and there is nothing to suggest that Dierks knew of or sanctioned the stipulation. By contrast, in the instant case, decedent knew of and authorized his agents to purchase the disputed bonds. Indeed, it is this knowledge and authorization which distinguishes this case from those relied upon by the government and makes this the proper occasion for me to undertake the equitable considerations discussed in *Merritt II*. See also *In re Berry's Estate*, 69 Misc.2d 397, 329 N.Y.S.2d 915 (1972). In that case, while the principal was in a coma her agent transferred funds of the principal to a Totten Trust account in favor of the agent's mother. The Court noted the dearth of New York law involving comatose principals but concluded that the agent's authority was suspended by virtue of that condition.

The two most recent cases involving comatose principals deal directly with the Flower Bond question. In the first, *Estate of Watson v. Simon*, 442 F.Supp. 1000 (S.D.N.Y.1977) *rev'd on other grounds* 586 F.2d 925 (2d Cir. 1978), this Court found that the decedent's illness did not operate automatically to revoke his agent's authority and thus, the bonds purchased while decedent was in a coma were property of the estate. It was reasoned that the purchase of the bonds benefited the estate and was ratified by the executrices. Thus, the case was distinguishable from the line of cases relied upon by the government, involving agents who acted in their own interests only.

*Estate of Pfohl,* 70 T.C. 630 (August 7, 1978) is the other recent case dealing with Flower Bonds. There the tax court treated the comatose condition of the principal as though it were a temporary insanity; that is, the acts of the agent were voidable, not void. The ratification by decedent's estate of the purchase of bonds operated to make decedent the owner of the bonds at the time of her death, *id.* at 3116, and thus, the Court found that the bonds were eligible for redemption.

■ It is clear from the above review of the relevant cases that the status of an agent's authority while the principal is in a comatose condition is by no means settled. It would be an easy matter to end the inquiry quickly by finding the agency suspended during a coma, as it is in the case of death or adjudicated insanity. Yet, I believe that a coma is more akin to temporary insanity than to death. A coma is not necessarily an unalterable state; it is merely a period of unconsciousness from which one may recover. It would be a hard law that automatically voided all actions of agents merely because the principal was in a comatose state. The better rule would provide some flexibility so that where the agent's acts were detrimental to the principal, they could be avoided by himself if he regained consciousness or by his representative if he did not. This is an equitable result which is particularly appropriate in a case such as the one at bar where the principal directed the very act which the government seeks to void. The cases suggesting that the agent's acts are a nullity where his principal is comatose are not necessarily irreconcilable. Since they all dealt with agents' acts which the principals' estate's sought to avoid, the Courts had no need to consider whether under different circumstances the acts might be considered voidable only. *See, e. g., In re Berry's Estate, supra; Estate of Dierks, supra.*

■ Because I find that the comatose condition of Mr. Manny rendered his agents' acts voidable only, and because those acts were ratified by his estate, Mr.

Manny was owner of the Flower Bonds at the time of his death. The question of the bonds' eligibility for redemption is thus, settled and judgment, will be entered in favor of the defendants.

Settle judgment on 10 days' notice.