OPINION OF THE COURT
Charles J. Thomas, J.
In March 2008 the New York City Commissioner of Social Services submitted a petition pursuant to Mental Hygiene Law article 81 for the appointment of a guardian for Hermina Brunson. Dimas Salaberios was appointed temporary guardian for Ms. Brunson.
At the time of the hearing which was commenced on February 28, 2009, and continued on various dates until May 8, 2009, Ms. Brunson’s home had been in foreclosure. The foreclosure action has been stayed pending the conclusion of the guardianship proceeding.
As part of the guardianship proceeding petitioner seeks to establish that Ms. Brunson was incapacitated from the year 2000 forward and that she lacked the capacity (1) to execute the deed transferring the property to her brother Joseph, and (2) to enter into mortgage agreements with Financial Freedom Senior Funding Corp. (hereinafter Financial Freedom) signed in December 2001 and June 2003. The temporary guardian seeks to vacate the mortgages because of Ms. Brunson’s incapacity and claims that the proceeds were used solely for the benefit of Ms. Brunson’s brother, Joseph Brunson. He also alleged that Ms. Brunson signed the mortgage agreement under physical and emotional duress from her brother.
Financial Freedom, which has appeared in this action with regard to the issues involving the mortgage, claims that Ms. Brunson had sufficient capacity to enter into the mortgage agreements on December 28, 2001 and June 20, 2003 and that even if she did not, the proceeds of the mortgage were used for her benefit. That being the case, Financial Freedom claims it is entitled to repayment of the monies expended from the mortgage proceeds.
It is agreed between the parties that Ms. Brunson purchased a one-family home in 1974 and held the property individually in *761 fee simple until October 12, 2001. At that time, Ms. Brunson signed a deed transferring her property to herself and her brother Joseph Brunson as joint tenants with the right of survivorship. It is also agreed that two reverse mortgages were executed by both Ms. Brunson and her brother Joseph Brunson — the first on December 30, 2001 for $300,000; the second on June 20, 2003 for $375,000. The second mortgage paid off and satisfied the first mortgage leaving only the June 20, 2003 mortgage outstanding.
At the hearing, Dr. Arthur Pierre Lewis testified that he treated Ms. Brunson from December 2000, when she was transferred from Elmhurst Hospital to Creedmore Psychiatric Hospital, until 2006. As her treating physician, Dr. Pierre Lewis diagnosed Ms. Brunson’s condition as chronic schizophrenia paranoid type. Dr. Pierre Lewis testified that he saw Ms. Brunson on a monthly basis and that Ms. Brunson was also treated by Dr. Penny, a psychologist, on a biweekly basis.
At the end of 2001, Ms. Brunson began suffering from a cognitive impairment that included a loss of memory and inability to function. She complained of hearing voices and suffered from delusions, including the delusion that her neighbor, who had recently been released from prison, was trying to take her home away from her. She also claimed that she no longer had the deed to the house.
At approximately the same time, Ms. Brunson also expressed anxiety and great fear of her brother, Joseph. Ms. Brunson claimed, among other things, that her brother was not feeding her. On several occasions Dr. Pierre Lewis witnessed the interaction between Ms. Brunson and her brother Joseph Brunson. Dr. Pierre Lewis felt that based on his expertise as a psychiatrist and on the interaction between the two siblings on these occasions, Joseph Brunson was mistreating Ms. Brunson. His findings resulted in his referring the matter to Adult Protective Services which, after reviewing the complaint, took no further action and closed the case.
Based upon the testimony of Dolly Cook, Ms. Brunson’s sister, and Dr. Pierre Lewis, the court finds that Ms. Brunson suffers from a mental illness which, from the time of her hospitalization in the year 2000, rendered her incapable of handling her financial affairs and from understanding the nature of the reverse mortgages entered into in 2001 and 2003 and their long-term implications. Her psychosis and delusions, which seem to center around the loss of her home, made it unlikely that she *762 could have distinguished that which was real from that which was delusional.
Prior to the enactment of Mental Hygiene Law article 81, the rights of the parties to a contractual agreement where one of the parties was incapacitated was set forth by the Court of Appeals, in Ortelere v Teachers’ Retirement Bd. of City of N.Y. (25 NY2d 196 [1969]).
“The avoidance of duties under an agreement entered into by those who have done so by reason of mental illness, but who have understanding, depends on balancing competing policy considerations. There must be stability in contractual relations and protection of the expectations of parties who bargain in good faith. On the other hand, it is also desirable to protect persons who may understand the nature of the transaction but who, due to mental illness, cannot control their conduct. Hence, there should be relief only if the other party knew or was put on notice as to the contractor’s mental illness” (at 205).
In 1992 when the legislature enacted article 81 of the Mental Hygiene Law, the requirement of knowledge of one party’s incapacity by the other was not included in the statute. Section 81.29 (d) of the Mental Hygiene Law provides as follows:
“(d) If the court determines that the person is incapacitated and appoints a guardian, the court may modify, amend, or revoke any previously executed . . . contract, conveyance, or disposition during lifetime or to take effect upon death, made by the incapacitated person prior to the appointment of the guardian if the court finds that the previously executed . . . contract, conveyance, or disposition . . . , was made while the person was incapacitated.”
Nevertheless, the Appellate Division continued to require that a mortgagee have knowledge of the mortgagor’s incapacity before the contract which is otherwise voidable could be voided. In order to void a contract which is voidable because of incapacity, the mortgagor must establish that the mortgagee had knowledge of the “incapacity and were . . . not bona fide mortgagees for value.” (See Weisberg v DeMeo, 254 AD2d 351, 351 [1998].)
In 1996, Congress authorized the National Housing Act which created reverse mortgages aimed at providing the elderly access to the equity in their home. When it did so, the Department of Housing and Urban Development stressed its concern about the *763 intricacies of a reverse mortgage and the need to insure that elderly individuals not risk their hard earned equity by entering into a reverse mortgage unless they fully understood the terms and significance of the mortgages to which they are agreeing. The very nature of the intended recipients of these mortgages renders such transactions suspect and thus a greater obligation is appropriately placed on the mortgagee than in an otherwise arm’s length transaction. Hence, the burden of knowledge which had been placed on the proponent seeking to void the contract due to the lack of capacity of a party by the Ortelere court must be shifted to the mortgagee when dealing with a reverse mortgage. In such cases it is sufficient if the mortgagee knew or could have known by the reasonable fulfilment of its statutory obligations. To rule otherwise would render the protections meaningless.
Congress’ concern is reiterated and codified in 24 CFR 206.41, the regulations that accompany the National Housing Act. To that end, the statute requires both counseling of the prospective mortgagors as well as the execution and submission of a certificate attesting that the counseling requirement had been either satisfied or waived. The statute requires that an attorney or certified counselor discuss and advise the prospective mortgagors of their rights and responsibilities under a Department of Housing and Urban Development guaranteed reverse mortgage. This certification was not meant to be perfunctory or a mere rubber stamp for the banking and mortgage industry. It was intended to secure that the rights of elderly homeowners were protected. The mortgagee is entrusted with the responsibility of conducting an inquiry of the applicant’s understanding of the mortgage agreement.
The purpose of the counseling is twofold. First, to insure that no one enters into a mortgage contract without a full understanding of his or her rights under the mortgage. Second, that a reviewing court can ascertain that the intent of the legislation has been accomplished and that the statutory requirements have been fulfilled. Here the court is not satisfied as to either.
Freedom Fidelity, which was unable to produce the individual who filled out the certificate of counseling, was unable to substantiate the details of what Ms. Brunson had been told. While the certificate, indicating that a Rosa Colarte certified that the homeowners had received counseling, was submitted into evidence (respondent’s evidence 14), there was no evidence as to the qualifications of Ms. Colarte or the counseling itself. *764 The certificate states that the counseling was not face-to-face but over the phone and that the total time was 45 minutes. The information on the certificate does not inform the court whether Ms. Colarte actually spoke to Ms. Brunson and, if so, what portion of the conversation was with Ms. Brunson as opposed to Joseph Brunson, who clearly dominated his sister’s actions. The court cannot ascertain what information Ms. Brunson was given by Ms. Colarte and whether she had or asked questions and, if so, what they were and whether her questions were answered.
There is no evidence that Ms. Brunson understood the terms of the mortgage or the counseling certificate that she signed on June 20, 2003. Under the circumstances of this case, any responsible counselor would have unearthed Ms. Brunson’s mental illness and her delusions regarding her house and determined that Hermina Brunson lacked the capacity to enter into the mortgage, or, at the very least, that further counseling was needed. While the certificate of counseling is an indication that information was given to the homeowners it is not dispositive of the issue of the mortgagor’s knowledge and understanding of the implications of a reverse mortgage or that the requirements under the National Housing Act have been satisfied. That determination rests ultimately with the court.
Under these circumstances, the court finds that Hermina Brunson was incapable of understanding the agreements that she signed on April 21, 2003 and that Financial Freedom is charged with the responsibility to determine, and was in a position to know of her incapacity. Therefore, the court finds the mortgages on June 20, 2003 void.
The court, however, recognizes that Ms. Brunson used a portion of the funds to benefit and protect her ownership rights in the property and to such extent Financial Freedom should be compensated.
Accordingly, the guardian is directed to reimburse Financial Freedom for monies paid out at the closing, including taxes, water charges and the New York City Department of Social Services liens.