**In re EADIE PROPERTIES, INC., Debtor.**

**Bankruptcy No. 81 B 20453.
Adv. No. 82 ADV 6304.**

United States Bankruptcy Court, S.D. New York.

July 14, 1983.

Constantine B. Filardi, Armonk, N.Y., trustee and attorney for trustee.

Andrew J. Fiore, Pleasantville, N.Y., for Westfield Realty Corp.

Buonomo & Thaler, Mount Kisco, N.Y., for Aguzzi Properties, Inc.

## DECISION ON TRUSTEE'S OBJECTIONS TO CLAIM ASSERTED AGAINST PROCEEDS OF SALE BY WESTFIELD REALTY CORP.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Having sold certain real estate free and clear of all liens with the liens to attach to the proceeds, the trustee in bankruptcy now objects to the claim asserted against the proceeds of sale by Westfield Realty Corp., a fifty percent shareholder of the debtor corporation, Eadie Properties, Inc.

### FINDINGS OF FACT

1. The debtor, Eadie Properties, Inc. ("Eadie") is a New York Corporation located in Mt. Kisco, New York. On July 28, 1981 an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against the debtor. On September 24, 1981 an order for relief was entered.

2. The debtor was formed as a result of a joint venture agreement dated May 25, 1978 between Westfield Realty Corp. ("Westfield"), a New York corporation located in New York City and Tribune Projects, Ltd. ("Tribune"), a New York corporation located in Mt. Kisco, New York. Westfield and Tribune each owned fifty percent of the stock of the debtor. At the time of the joint venture agreement, Westfield was the owner of approximately 86 acres of unimproved real estate located in the Town of North Castle in Westchester County, New York, consisting of nine building lots.

3. Pursuant to the joint venture agreement, Westfield agreed to permit Tribune to enter upon the property owned by Westfield for the purpose of constructing and selling nine single family houses on each of the nine building lots owned by Westfield.

Tribune agreed to pay Westfield $2,000 from the proceeds of the building loan obtained for each of the nine lots and an additional $6,000 upon the title closing of each house, for a total of $8,000 per lot.

4. The joint venture agreement further provided that if it were necessary to obtain a development loan for the purpose of installing the improvements then Westfield would convey all of the lots to the debtor, Eadie, at the time of the closing of the development loan. In such case, the debtor would pay to Westfield upon closing of the development loan, $2,000 for each lot conveyed to the debtor, with Westfield retaining a second mortgage "or such other lien consistent with the development loan as shall be reasonably designated by counsel for Westfield." Although the agreement provides for the retention of a second mortgage on the part of Westfield, no mortgage agreement was ever formally entered into between Eadie and Westfield.

5. The joint venture agreement provided that all decisions with respect to the debtor corporation would be made by the unanimous decision of its board of directors. Westfield nominated its principal, George Crohn, Jr., as a director, whereas Tribune nominated its principal, Nicholas Della Greca, as a director of the debtor.

6. Paragraph 10 of the joint venture agreement provided:

"If the Corporation decides, by the unanimous vote of its Board of Directors, to sell unimproved land to a third party, the first $8,000 per building lot from the proceeds thereof will be allocated to Westfield, expenses directly connected with the transaction will be paid, and the balance of the proceeds will be net profit to the Corporation."

7. Paragraph 15 of the joint venture agreement provided for a termination of the agreement 20 months after the filing of a subdivision plot map, which was filed on June 5, 1979. Thus, the joint venture agreement terminated by its own terms on February 5, 1981.

8. Pursuant to the joint venture agreement, Westfield conveyed the nine building lots in question to the debtor corporation by deed dated August 13, 1979.

9. During the term of the agreement, two single family houses were constructed on building lots number one and two, which were thereafter conveyed to third party purchasers. No homes were built on the remaining seven vacant building lots.

10. Internal differences developed between the principals, namely George Crohn, Jr. and Nicholas Della Greca, with the result that towards the end of 1980 a meeting was held at the home of Robert Fisher, the attorney for Westfield, at which time Crohn and Della Greca discussed a termination of the joint venture. One of the proposals suggested was that Della Greca would relinquish his interest in some property in Bedford, New York in exchange for his taking over the remaining seven building lots. However, the differences between the parties were not resolved.

11. Nicholas Della Greca, the principal of Tribune, was originally introduced to George Crohn, Jr., the principal of Westfield, by Vera Aguzzi, a licensed real estate broker, who knew that Westfield owned nine vacant building lots in North Castle and believed that Della Greca and Tribune could develop the lots for Westfield under a joint venture relationship.

12. Della Greca had previous business dealings with Aguzzi and owed Aguzzi approximately $18,000 to $20,000 for unpaid real estate commissions, for which Aguzzi had obtained a judgment against Della Greca.

13. In February, 1981, Della Greca approached the Aguzzi Real Estate office and informed them that a mortgage foreclosure was imminent against the joint venture property owned by the debtor and that Aguzzi should find "a quick buyer" before the foreclosure occurred. Della Greca informed Aguzzi that Tribune and Westfield were splitting up and that he "controlled" the property in question. He instructed Aguzzi to "find me a buyer."

14. Della Greca never informed the other joint venture participant, Westfield, that he intended to sell all of the remaining vacant property that had been deeded to the joint venture debtor by Westfield. Indeed, Della Greca never obtained the unanimous consent of the debtor's board of directors to sell all of its unimproved property as required under paragraph 10 of the joint venture agreement of May 25, 1978.

15. On February 25, 1981, approximately twenty days after the joint venture agreement had terminated by its own terms, Della Greca, as president of the joint venture debtor, Eadie Properties Inc., entered into a contract for the sale of the remaining seven vacant building lots to a buyer known as Quality Homes, Inc. for $330,000. Paragraph 17 of the contract states in part: "No broker brought about this transaction."

16. In a separate letter dated February 25, 1981, Della Greca, as president of the debtor, agreed in pertinent part as follows:

"The seller, Eadie Properties Corp., agrees to pay Vera Aguzzi $40,000.00 commission relative to the purchase of 7 lots in the Town of North Castle, County of Westchester, sold by Eadie Properties Corp. to Armonk Quality Homes, Inc."

17. On March 16, 1981, Westfield filed a lis pendens in Westchester County, State of New York and a summons and complaint reciting the joint venture agreement and its termination together with its claim that the debtor was obligated to reconvey the seven vacant building lots to Westfield following the termination of the joint venture agreement.

18. Pursuant to New York CPLR § 6501, the notice of pendency of Westfield's action with respect to its claim for the seven vacant building lots was constructive notice of such claim to all subsequent parties, including the debtor's trustee in bankruptcy,[1] who was appointed as a result

---

1. For a discussion of the powers of a trustee under Bankruptcy Code § 544(a)(3) when there

has been a prior recording of a lis pendens, see

of an involuntary petition that was filed after the lis pendens had been recorded.

19. The trustee in bankruptcy did not assume the debtor's contract, dated February 25, 1981, to sell its seven vacant building lots to Quality Homes, within sixty days after the entry of the order for relief. Accordingly, the contract is deemed rejected pursuant to 11 U.S.C. § 365(d)(1).

20. Vera Aguzzi Real Estate filed an unsecured claim for $40,000 against the debtor for the commissions that Della Greca committed the debtor to pay in connection with the rejected sale of the seven building lots in question.

21. The trustee in bankruptcy offered at auction the seven vacant lots in question and eventually sold them to Quality Homes, Inc., the successful bidder (Quality was also the purchaser of the property under the rejected executory contract dated February 25, 1981). The purchase price was $323,400 "free and clear of all liens and encumbrances, if any, with such valid liens and encumbrances to attach to the proceeds subject to final determination by the Court of the validity thereof." Thus, Quality Homes, Inc. eventually purchased the property in question at the trustee's sale for $6,600 less than it originally agreed to pay under the rejected executory contract signed by Della Greca on February 25, 1981.

## DISCUSSION

All of the parties concede that the proceeds of sale now held by the trustee in bankruptcy must first be applied to the payment of any liens, administration expenses and allowed claims of unsecured creditors which have been filed against the debtor, Eadie Properties, Inc. Westfield, a fifty percent shareholder of the debtor, argues that the funds remaining after the payment of all claims should be turned over to it to the exclusion of Tribune, the other fifty percent shareholder. The Aguzzi Real Estate Office has submitted an unsecured claim for the $40,000 broker's commission that Nicholas Della Greca, as president of the debtor, agreed to pay in connection with the rejected sale of all of the debtor's vacant land. Both the trustee and Westfield object to the $40,000 Aguzzi commission claim.

Westfield agreed in writing to convey its nine vacant building lots to the debtor pursuant to a joint venture agreement that was to last for a period of twenty months, during which time Tribune was to construct and sell single family homes, with Westfield and Tribune sharing in the profits after Westfield was paid $8,000 per lot for each lot that was sold. However, the joint venture agreement failed to state what was to happen after its termination at the end of twenty months and specifically omitted any requirement that any vacant lots remaining unsold after the twenty months period should be reconveyed to Westfield. The joint venture agreement provided that Westfield was entitled to receive a mortgage for the vacant lots that it conveyed to the debtor, at $8,000 per lot, but no such mortgage was ever executed in favor of Westfield. Since all conveyances and contracts concerning real property are required to be in writing, § 5–703 New York General Obligations Law, it follows that any oral understanding between the parties as to a reconveyance would not be enforceable. Westfield argues that although the proceeds from the sale of all of the debtor's property may be applied to the payment of allowed claims, its right to the remainder of the proceeds after such payment should be superior to Tribune, the other fifty percent shareholder of the debtor, so that Tribune should be excluded from sharing in the proceeds from the trustee's sale of the vacant land that Westfield originally conveyed to the debtor. Before determining the dispute between the shareholders, Westfield and Tribune, it must first be ascertained whether or not the Aguzzi Real office holds a valid claim for $40,000 in commissions that Nicholas Della Greca, as president of the debtor, agreed to pay it for finding "a quick buyer." The trustee contends that the $40,000 figure was inflated by Aguzzi so as to

*In re Gurs*, 27 B.R. 163 (Bkrtcy.App. 9th Cir. 1983).

include Della Greca's past due debts for unpaid commissions of $20,000 that were reduced to a judgment by Aguzzi against Della Greca.

### THE CLAIM FOR COMMISSIONS

A sale of all or substantially all of the assets of a New York corporation is governed by § 909 of The New York Business Corporation Law, which provides in pertinent part as follows:

"§ 909. Sale, lease, exchange or other disposition of assets.

(a) A sale, lease, exchange or other disposition of *all or substantially all* the assets of a corporation, *if not made in the usual or regular course of the business actually conducted by such corporation,* shall be authorized only in accordance with the following procedure:

(1) The board shall authorize the proposed sale, lease, exchange or other disposition and direct its submission to a vote of shareholders.

(2) Notice of meeting shall be given to each shareholder of record, whether or not entitled to vote.

(3) The shareholders shall approve such sale, lease, exchange or other disposition and may fix, or may authorize the board to fix, any of the terms and conditions thereof and the consideration to be received by the corporation therefor, which may consist in whole or in part of cash or other property, real or personal, including shares, bonds or other securities of any other domestic or foreign corporation or corporations, by *vote at a meeting of shareholders of the holders of two-thirds of all outstanding shares* entitled to vote thereon." [Emphasis added].

In the instant case, the debtor's president, Nicholas Della Greca, informed the Aguzzi Real Estate office that Westfield and Tribune were splitting up as joint venturers and that he wanted Aguzzi to find a buyer for all of the remaining real estate owned by the debtor. Aguzzi knew that the debtor was formed to construct and sell finished homes. Nevertheless, Aguzzi never questioned Della Greca's authority to sell all of

the debtor's undeveloped real estate and now claims the agreed upon commission for having found a willing buyer. This case is strikingly similar to *Tabenhouse v. International Oxygen Co.,* 74 F.2d 748 (2d Cir.1935) where commissions were sought for obtaining a purchaser of the defendant's business. The Second Circuit Court of Appeals agreed that the transaction was not in the ordinary course of the defendant's business and one which its officers were not presumptively authorized to make for it. The court concluded that since the defendant's officers were not authorized under New York law to enter into a binding contract to sell all of the defendant corporation's business, the corporation was not liable to pay a broker's commission for having found a willing buyer. Similarly, in *Matter of Timmis,* 200 N.Y. 177, 93 N.E. 522 (1910), which involved Section 16 of the New York Stock Corporation Law, the predecessor to § 909 of the New York Business Corporation Law, the New York Court of Appeals held that even the sale of a department of a corporation was so integral a part of the corporation as to require the then necessary consent of the holders of two-thirds of the stock of the corporation. In the absence of any power granted in the certificate of incorporation (which was not introduced into evidence) allowing the debtor to sell all of its real property, the debtor's president in the instant case would not have been authorized to sell all of the debtor's assets without first obtaining the requisite consent prescribed under § 909 of the New York Business Corporation Law. Indeed, Della Greca's conduct violated the express language of paragraph 10 of the joint venture agreement which required the unanimous vote of the debtor's board of directors to sell unimproved land to a third party. In short, Della Greca could not bind the debtor to sell all of its unimproved land. *Trulock v. Kings County Iron Foundry, Inc.,* 216 A.D. 439, 215 NYS 587 (1st Dept.1926); *Berwin & Co., Inc. v. Hewitt Realty Co.,* 199 A.D. 453, 191 NYS 817 (1st Dept.1922) aff'd, 235 N.Y. 608, 139 N.E. 754 (1923); *People v. Ballard,* 134 N.Y. 269, 32 N.E. 54 (1892).

There is, however, a line of cases holding that a sale of all of the assets of a real estate corporation actively engaged in the purchase and sale of real estate is considered to be in the ordinary course of business and would not require the two-thirds approval of the shareholders. *In re Roehner,* 6 A.D.2d 580, 180 N.Y.S.2d 586 (1st Dept.1958), aff'd 6 N.Y.2d 280 (1959); *Eisen v. Post,* 1 A.D.2d 344, 149 N.Y.S.2d 864 (1st Dept.1956), rev'd on other grounds, 3 N.Y.2d 518, 169 N.Y.S.2d 15, 146 N.E.2d 779 (1957); *Epstein v. Gosseen,* 235 A.D. 33, 256 N.Y.S. 49 (1st Dept.1932). However, this exception cannot apply in this case because the certificate of incorporation of the debtor was never produced. There was therefore no evidence as to the debtor's authority to engage in any business other than the sale of finished homes. Moreover, the joint venture had terminated by its express terms even before Della Greca attempted to sell all of the debtor's assets. Thus, the debtor was no longer authorized to engage in any business when Della Greca sought to dispose of its assets. Even if the debtor were authorized to sell vacant real estate, and even if the joint venture agreement had not terminated, Della Greca patently violated the terms of the joint venture agreement, which called for the unanimous approval of the debtor's board of directors prior to the sale of unimproved land to a third party. Hence, any such sale would therefore have been outside the ordinary course of transactions permitted to occur and Della Greca was without authority to sell all of the debtor's real estate.

Since Della Greca was without power to sell all of the debtor's assets, he was also without power to bind the debtor to pay a commission to the Aguzzi Real Estate office, as broker, for procuring a willing purchaser. *Trulock v. Kings County Iron Foundry, Inc.,* supra; *Tabenhouse v. International Oxygen Co.,* supra. An agent's authority is coterminous with that of the principal and thus there is no authority to bind the principal unless the principal has the capacity to enter into the legal relations sought to be created by the agent. See *Central Trust Co., Rochester v. Sheah-*

*en,* 66 A.D.2d 1015, 411 N.Y.S.2d 741 (4th Dept.1978); *U.S. v. Manny,* 463 F.Supp. 444 (D.C.S.D.N.Y.1978) aff'd, 645 F.2d 163 (2d Cir.1981). Accordingly, the objections by the trustee and Westfield to the Aguzzi claim for $40,000 in commissions are sustained and the claim will be expunged.

### WESTFIELD'S CLAIM TO THE REMAINING PROCEEDS

It appears that after all expenses and claims are satisfied there may be a balance available for distribution to the shareholders of the debtor, namely Westfield and Tribune. As between themselves, Westfield seeks to exclude Tribune from sharing in the remaining proceeds because Westfield originally owned the real estate that generated the proceeds of the trustee's sale. However, as previously noted, the joint venture agreement failed to provide for a reconveyance of the vacant land to Westfield upon the termination of the joint venture. Moreover, the evidence was inadequate as to how much Tribune had contributed to the joint venture or the extent of its claim against the proceeds. However, the parties had agreed in writing, as reflected in paragraph 10 of the joint venture agreement, that Westfield was to recover $8,000 for each authorized sale of an unimproved lot to a third party "and the balance of the proceeds will be net profit to the Corporation [the debtor]." Although the joint venture agreement terminated by its own terms on February 5, 1981, it serves as evidence as to the agreed priority of the shareholders vis a vis each other as to the distribution of the net proceeds from the sale of unimproved lots. In as much as the trustee's sale involved the seven remaining unimproved lots, it follows that the shareholders have agreed that Westfield is to receive $56,000, representing $8,000 for each of the seven lots, before Westfield and Tribune share in the balance of the proceeds. Hence, Westfield shall have priority over Tribune to the extent of $56,000 with respect to any surplus held by the trustee after the payment of administration expenses and all claims. Manifestly, there

was no intention that Tribune should receive a windfall as a result of Westfield's conveyance of the vacant lots to the debtor.

### CONCLUSIONS OF LAW

1. The attempted sale of all of the debtor's unimproved real estate by its president, Nicholas Della Greca was not in the ordinary course of the debtor's business and was unauthorized. Such attempted sale violated § 909 of the New York Business Corporation Law.

2. Even if the debtor were considered a real estate corporation with authority to sell all of its unimproved assets in the ordinary course of primary business, such sale was unauthorized because the joint venture business had terminated by its own terms and because it was contrary to the written provisions of the joint venture agreement.

3. In view of the fact that the debtor's president was not authorized to bind the debtor to a contract for the sale of all of its real estate, he was similarly not empowered to bind the debtor to pay a broker's commission to the Aguzzi Real Estate office for procuring a willing purchaser.

4. The Aguzzi claim for $40,000 for commissions pertaining to the rejected sale of all of the debtor's remaining unimproved lots shall be expunged in accordance with the objections to such claim voiced by the trustee in bankruptcy and Westfield.

5. Westfield is not entitled to a reconveyance of the real estate it previously conveyed to the debtor under the joint venture agreement nor does the joint venture agreement support Westfield's entitlement to all of the proceeds from the trustee's sale of the debtor's real estate.

6. The trustee shall first apply the proceeds from the sale of the debtor's real estate to the payment of the secured claims, administration expenses and allowed unsecured claims filed against this estate.

7. Westfield shall be entitled to receive from the surplus on hand after the payment of administration expenses and all claims, the sum of $56,000 before the net balance of the proceeds is distributed to the shareholders of the debtor.

SUBMIT ORDER on notice in accordance with the foregoing.