VIOLA FARNUM vs. JOSEPH SILVANO, THIRD.

No. 88-P-966.

Barnstable. February 21, 1989. — June 30, 1989.

Present: KASS, WARNER, & FINE, JJ.

*Unsound Mind. Contract*, Rescission, Sale of real estate. *Restitution. Deed*, Rescission.

In an action for rescission of a sale of real property, the judge's findings, which were supported by the evidence, warranted conclusions by this court that the mentally impaired plaintiff, ninety years old at the time of the transaction, did not possess the competence to enter into a contract to sell her house for approximately half its market value and further, that the defendant knew or had reason to know of the plaintiff's inability to act in a reasonable manner, with the result that the defendant was to reconvey the property to the plaintiff in return for the consideration paid with appropriate adjustments to effect a fair restoration of the status quo. [539-541]

CIVIL ACTION commenced in the Barnstable Division of the Probate and Family Court Department on April 6, 1987.

The case was heard by *Edward W. Farrell*, J.

*Herbert F. Lach, Jr.* (*Diane A. Shrank* with him) for the plaintiff.

*Michael P. Pagnozzi* for the defendant.

KASS, J. On the basis of a finding that Viola Farnum enjoyed a lucid interval when she conveyed her house to Joseph Silvano, III, for approximately half its market value, a Probate Court judge decided that Farnum had capacity to execute the deed. A different test measures competence to enter into a contract and we, therefore, reverse the judgment.

We take the facts from the trial judge's findings, which have support in the record and are not clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). When she sold her real estate in South Yarmouth on July 14, 1986, Farnum

was ninety years of age. The sale price was $64,900. At that time, the fair market value of the property was $115,000. Indeed, at the closing, the buyer, Silvano, obtained a mortgage loan from a bank of $65,000. Silvano, age twenty-four, knew Farnum from mowing her lawn and doing other landscape work. Farnum trusted him and had confidence in him. Before entering into the transaction, Silvano had been put on notice of the inadequacy of the price he was going to pay. He had been warned not to proceed by Farnum's nephew, Harry Gove, who is now Farnum's guardian and is pressing this action for rescission on her behalf.

Farnum's mental competence had begun to fail seriously in 1983, three years before she delivered a deed to the South Yarmouth real estate. That failure manifested itself in aberrant conduct. She would lament not hearing from sisters who were dead. She would wonder where the people upstairs in her house had gone, but there was no upstairs to her house. She offered to sell the house to a neighbor for $35,000. (He declined, recognizing the property was worth much more.) She became abnormally forgetful. Frequently she locked herself out of her house and broke into it, rather than calling on a neighbor with whom she had left a key (on one occasion, she broke and entered through a basement window). She hid her cat to protect it from "the cops . . . looking for my cat." She would express a desire to return to Cape Cod although she was on Cape Cod. She easily became lost. Payment of her bills required the assistance of her sister and her nephew, who also balanced her check book.

There were several hospitalizations during the three-year period preceding the conveyance in 1986. On May 2, 1985, a brain scan examination disclosed organic brain disease. By January, 1987, some six months after the conveyance, Farnum was admitted to Cape Cod Hospital for treatment of dementia and seizure disorder. She was discharged to a nursing home.

In connection with drawing the deed and effecting the transfer of real estate, Farnum was represented by a lawyer selected and paid by Silvano. That lawyer, and a lawyer for the bank which was making a loan to Silvano, attended the closing at

Farnum's house. At the closing Farnum was, as the trial judge expressed it, "aware of what was going on." She was cheerful, engaged in pleasantries, and made instant coffee for those present. After the transaction, however, Farnum insisted to others — her sister and nephew, for example — that she still owned the property. That may have been consistent with Farnum's ambivalence about giving up her home and going to a nursing home.

It was not unusual, the judge concluded, for Farnum to be perfectly coherent and "two minutes later" be confused. When she signed the deed, "she was coherent or in a lucid interval."

Acting during a lucid interval can be a basis for executing a will. "[A] person of pathologically unsound mind may possess testamentary capacity at any given time and lack it at all other times." *Daly* v. *Hussey*, 275 Mass. 28, 29 (1931). *Wellman* v. *Carter*, 286 Mass. 237, 247 (1934). *Sletterink* v. *Rooney*, 1 Mass. App. Ct. 809 (1973). 2 Newhall, Settlement of Estates § 343 (4th ed. 1958).

Competence to enter into a contract presupposes something more than a transient surge of lucidity. It involves not merely comprehension of what is "going on," but an ability to comprehend the nature and quality of the transaction, together with an understanding of its significance and consequences. *Sutcliffe* v. *Heatley*, 232 Mass. 231, 232-233 (1919). *Meserve* v. *Jordan Marsh Co.*, 340 Mass. 660, 662 (1960). *Krasner* v. *Berk*, 366 Mass. 464, 467 (1974). See Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale L.J. 271, 298-305 (1944); Note, Mental Illness and Contracts, 57 Mich. L. Rev. 1020, 1026-1030 (1959). From a testator we ask awareness of the natural objects of bounty. The choice among those objects may be seen by others as arbitrary, but arbitrariness or capriciousness may be allowed a donor. In the act of entering into a contract there are reciprocal obligations, and it is appropriate, when mental incapacity, as here, is manifest, to require a baseline of reasonableness.

In *Krasner* v. *Berk*, *supra* at 468, the court cited with approval the synthesis of those principles now appearing in the Restatement (Second) of Contracts § 15(1) (1981), which regards as voidable

a transaction entered into with a person who, "by reason of mental illness or defect (a) . . . is unable to understand in a reasonable manner the nature and consequences of the transaction, or (b) . . . is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of [the] condition."

Applied to the case at hand, Farnum could be aware that she was selling her house to Silvano for much less than it was worth, while failing to understand the unreasonableness of doing so at a time when she faced serious cash demands for rent, home care, or nursing home charges. That difference between awareness of the surface of a transaction, i.e., that it was happening, and failure to comprehend the unreasonableness and consequences of the transaction by a mentally impaired person was recognized and discussed in an opinion for the court by Judge Breitel, in *Ortelere* v. *Teachers' Retirement Bd.*, 25 N.Y.2d 196, 202-206 (1969). In the *Ortelere* case, a teacher who was enrolled in a retirement plan suffered a psychotic break. Her age was sixty and she also suffered from cerebral arteriosclerosis. While thus afflicted, Grace Ortelere changed her selection of benefit to choose the maximum retirement allowance payable during her lifetime with nothing payable after her death — this in the face of severely diminished life expectancy and her husband having given up his employment to care for her full time. The court observed that "her selection of a 'no option' retirement while under psychiatric care, ill with cerebral arteriosclerosis, aged 60, and with a family in which she had always manifested concern, was so unwise and foolhardy that a factfinder might conclude that it was explainable only as a product of psychosis." *Id.* at 206. A major factor in the court's decision was that the retirement board "was, or should have been, fully aware of Mrs. Ortelere's condition." *Id.* at 205.

On the basis of the trial judge's findings, we think Farnum did not possess the requisite contextual understanding. She suffered mental disease which had manifested itself in erratic and irrational conduct and was confirmed by diagnostic test. Her physician did not think she was competent to live alone.

Relatively soon after the transaction, Farnum's mental deficits grew so grave that it became necessary to hospitalize her. The man to whom she sold her property for less than its value was not a member of her family or someone who had cared for her for long duration. Silvano's explanation that he gave Farnum the additional consideration of agreeing to let her stay in the house for some time after the closing is unpersuasive, as the purchase and sale agreement and the deed are silent about any such agreement. Farnum was not represented by a lawyer who knew her and considered her over-all interests as a primary concern. The mission of the lawyer secured by Silvano, and paid by him, was to effect the transaction. As we have observed, Farnum faced growing cash demands for her maintenance, and, in her circumstances, it was not rational to part with a major asset for a cut-rate price.

The decisive factor which we think makes Farnum's delivery of her deed to Silvano voidable was his awareness of Farnum's inability to act in a reasonable manner. See Restatement (Second) of Contracts § 15(1)(b). Silvano knew or had reason to know of Farnum's impaired condition from her conduct, which at the times material caused concern to her relatives, her neighbors, and her physician. See *Ortelere* v. *Teachers' Retirement Bd.*, 25 N.Y.2d at 205. Silvano was aware that he was buying the house for about half its value.[1] He had been specifically warned by Farnum's nephew about the unfairness of the transaction and Farnum's mental disability.

In view of our conclusion that Farnum lacked the capacity to enter into contractual arrangements for the sale of her house, we need not and do not consider the arguments of fraud, undue influence, and constructive trust which Farnum has advanced.

Farnum is entitled to rescission of the conveyance. Silvano shall deliver a deed to the real estate in question to Farnum's guardian in his capacity as such, in return for the consideration paid by Silvano. The object of rescission is to arrive so far as

---

[1] The judge's finding of a fair market value of $115,000 was based on an appraisal of the real estate received in evidence. Under the purchase and sale agreement, Silvano was to receive the furniture and furnishings as well for his purchase price.

possible at full restoration of the status quo before the transaction which is being cancelled. *Long* v. *Athol*, 196 Mass. 497, 506 (1907). *Ginn* v. *Almy*, 212 Mass. 486, 505 (1912). *Lang* v. *Giraudo*, 311 Mass. 132, 139-140 (1942). *Powers, Inc.* v. *Wayside Inc. of Falmouth*, 343 Mass. 686, 694 (1962). *Limoli* v. *Accettullo*, 358 Mass. 381, 386 (1970). *Lyons* v. *Rainbow Recording Corp.*, 1 Mass. App. Ct. 783, 785 (1974). See *Enterprises, Inc.* v. *Cardinale*, 331 Mass. 244, 247 (1954). In achieving rescission, it is appropriate to give account to the value of possessing or the rental value of the real estate from July 14, 1986, to the date a revised judgment is entered. See *Lang* v. *Giraudo*, 311 Mass. at 139; Restatement of Restitution § 159 (1937); Restatement (Second) of Restitution § 20 (Tent. Draft No. 1, 1983). Consideration must be given to accounting for benefits which the claimant for rescission (i.e., Farnum) may have received, e.g., taxes paid on the real estate. Restatement of Restitution § 158. Restatement (Second) of Restitution §§ 8, 24, 29 (Tent. Draft No. 1). Generally, consideration ought not to be given to any improvements in the property which Silvano may have made, because they were not requested by the plaintiff, or to Silvano's mortgage payments. *Lang* v. *Giraudo*, 311 Mass. at 141. But compare *Thibbitts* v. *Crowley*, 405 Mass. 222, 230 (1989), which authorizes making allowance for improvements when the equities of a particular case so indicate. When a defendant-buyer wrongly acquires real estate and rescission is ordered, it does not appear, on a review of the cases, that interest is generally required to be paid on the returned purchase price, although we do not hold that so to order would go beyond the discretion of a trial judge who is framing an order designed to effect a fair restoration of the status quo. The judgment is vacated, and the case is remanded to the Probate Court for the entry of a judgment of rescission consistent with this opinion.

*So ordered.*